UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
TEDDY WILLIAMS,

                        : 

              Petitioner,       REPORT & RECOMMENDATION

                        : 

         -against-         09 Civ 7411 (RJH)(MHD)

                        : 

LUIS R. MARSHALL, Superintendent,
Sing Sing Correctional Facility,:

        Respondent.    :

-------------------------------x

TO THE HONORABLE RICHARD J. HOLWELL, U.S.D.J.:


     Pro se petitioner Teddy Williams seeks a writ of habeas corpus

to challenge his August 2005 conviction in the New York State

Supreme Court, New York County, on one count of Attempted Murder in

the Second Degree (N.Y. Penal Law §§ 110, 125.25 [1]), two counts

of Assault in the First Degree (N.Y. Penal Law §120.10[1], [2]),

and single counts of Criminal Possession of a Weapon in the Second

and Third Degrees (N.Y. Penal Law, §265.03[2][1], §265.02[4]).[2] The

---

    [1]Section 265.03[2] was amended by N.Y. L.2006, c. 745, § 1,
eff. Dec. 15, 2006, recodifying the offense as section
265.03[1][b].

    [2]Section 265.02[4] was repealed by N.Y. L.2006, c.742, §1,
eff. Nov. 1, 2006, which upgraded the offense to criminal
possession of a weapon in the second degree under Section
265.03[3].

1

trial court sentenced Williams, as a persistent violent felony offender[3], to three indeterminate prison terms of 21 years to life, one term of 16 years to life, and one term of 12 years to life, all to run concurrently. Williams is currently serving his sentence at the Sing Sing Correctional Facility.

In his timely petition, which we read liberally, Williams asserts two claims, both of which he unsuccessfully raised on his direct appeal in state court. First, petitioner asserts that the verdict was against the weight of the evidence. Second, he contends that, in violation of N.Y. Crim. Proc. L. §60.22[1], the evidence was insufficient to corroborate the testimony of petitioner's accomplice.

Respondent opposes the petition. He argues that neither claim rests on federal law, that the accomplice-corroboration claim is procedurally barred, and that both claims are meritless.

In reply papers, petitioner concedes that his weight-of-the-

---

[3] A persistent violent felony offender in New York is defined as a person who has been convicted of a "violent felony offense . . . after having previously been subjected to two or more predicate violent felony convictions." N.Y. Penal Law § 70.08.

evidence claim is based solely on state law. (Pet'r Trav., 4, 6, Dec. 22, 2009). As for his accomplice-corroboration claim, he asks that it be interpreted as a constitutionally-based insufficiency-of-the-evidence claim.[4] (Pet'r Trav., 6).

I. <u>Prior Proceedings</u>

    A. <u>Pre-Trial Proceedings</u>

Petitioner's conviction stemmed from the June 2004 shooting of a drug dealer named Scott Perine in Riverside Park on the west side of Manhattan. Williams and a fellow drug dealer named Richard Nelson were eventually arrested for the attack, which Perine survived.

On September 10, 2004 a grand jury in New York County charged petitioner and Nelson with Attempted Murder in the Second Degree, Assault in the First Degree (intent to cause serious physical injury), Assault in the First Degree (intent to disfigure),

---

[4] In Williams's reply papers, he also requested that the court stay this proceeding to permit him to return to state court to assert two ineffective-assistance-of-counsel claims by way of a <u>coram nobis</u> application. We have denied this request by a separate memorandum and order issued today.

Criminal Possession of a Weapon in the Second Degree (intent to use), and Criminal Possession of a Weapon in the Third Degree (possession other than in the home or place of business). (Ind. No. 4758/04). In May 2005, Nelson signed a written cooperation agreement with the District Attorney, with the understanding that he would receive a reduced sentence. His cooperation consisted of providing testimony, under threat of a perjury prosecution, that he had in fact shot Perine at the direction of petitioner, who had provided the gun and instructed Nelson to shoot. (Tr. 481-83).

B. Trial

Trial commenced before the Honorable Budd Goodman, S.C.J., and a jury on August 1, 2005. The State called the victim, Scott Perine; the accomplice, Richard Nelson; and three civilian eye-witnesses, Elizabeth Tracey Jamar, Anthony Korf, and Shanti-Rica Joseph. The prosecutor also called a paramedic, Luis Parra; and six police witnesses -- Sergeant Daniel Waldron, Sergeant Nicholas Chernjawski, Officer Bryant Pineda, Officer Sylvia Williams, Detective Terrence Felder, and Detective Mark Basoa. The defense called no witnesses.

4

### 1. The State's Case

#### (a). Perine's Account

The complainant witness, Perine, had a considerable criminal past, including drug dealing and possession, robbery, assault, and parole violation originating in 1991 and continuing through 2003. (Tr. 413-15). He testified that at the time of the shooting, he was working as an "enforcer" for a group of drug dealers, headed by three men whom he identified as "Block," "Alamo" and Teddy Williams, who is Block's brother. (Tr. 380, 387). Perine said that he had known petitioner for about a month at the time of the shooting, and saw him almost every day over that time period. Perine had observed that petitioner was a partner in the drug operation with Alamo, and that Williams also worked often with Richard Nelson, a street drug dealer. According to Perine, he often witnessed money and drug packages exchanging hands between Williams and the other drug dealers. (Tr. 388-89). Perine's role in the operation was to protect Nelson, whom he referred to as "Cuban." (Tr. 381).

Perine testified that, some days before the shooting, he and

5

the petitioner's brother, Block, had been approached by a rival drug-dealing gang. One of the rivals told Block that he was not supposed to deal drugs in that area and "made a big scene," ordering Perine and Block to leave. (Tr. 383-84). Shortly thereafter, the competing dealer returned, and when he saw that Block and Perine were still there, he punched Perine in the face. A fight ensued, and the assailant ran off, only to return with several other men who were wielding guns. However, the confrontation soon dissipated without any further violence. (Tr. 384).

During the evening of June 15, 2004 another similar incident occurred, this time sparked by Nelson's presence at a drug-dealing site claimed by another gang. One of the rival drug dealers drew a gun on Nelson and threatened to "pistol whip" him after Nelson refused to heed a warning not to sell drugs in that particular area. (Tr. 385). Again Perine intervened and defused the situation without any violence. (Tr. 386, 465).

Because of these two incidents, Perine felt that he deserved compensation for the protection that he had been providing Block's gang, and he told Nelson that he wanted to be paid for his

6

services. (Tr. 387). According to Perine, he and Nelson came to an understanding, in which Nelson would give Perine all the drugs that he had on him -- 30 mini-ziplock bags, worth approximately $10 each, totaling $300 in drugs -- and $100 in cash. (Tr. 390). Nelson would then tell the Williamses, who were his suppliers, that Perine had stolen the drugs and money from him. (Tr. 465). As part of this arrangement, Perine would meet Nelson later on at 97th Street and Riverside Park to split the drugs.  (Tr. 391).

   In Perine's account, while waiting for Nelson in the park, he saw Williams and Nelson enter the park. He described Williams as being bald at the time, and reported that Nelson used to wear a blue do-rag. (Tr. 415). He could not recall what was said during his encounter with Williams and Nelson other than -- approximately a minute before the shooting -- Williams saying "Oh, why did you do it?" (Tr. 395-96). He saw Nelson pull out a gun, which he recognized to be a .32 caliber handgun, and point it at him. He remembered hearing the shots, but did not specifically recall being shot. (Tr. 397, 450). On cross-examination he maintained that he had not been drunk the morning of the shooting (Tr. 438), although defense counsel offered evidence that Perine's blood alcohol level was well above the legal limit. (Tr. 534).

Perine testified that on July 16, 2004 -- approximately one month after being shot -- he spoke to the police but did not give them a full account of the events that had transpired because he wanted to "take care of it" himself, and he therefore did not identify who had been involved in the incident. (Tr. 102). He recounted, however, that he was visited again in September 2004 by Detective Felder and that by that time he had changed his mind and named Nelson as his shooter, identifying him in a photo array. (Tr. 406-07).

Perine also described his medical recovery. He testified that he had stayed at St. Luke's Hospital for one and half months, but had been unconscious for all but the last few weeks of his stay. He then remained at a rehabilitation facility for three to four months for occupational, physical and speech therapy. (Tr. 408-09). The therapy was needed because he had lost some mobility and sensation in his left pinky and ring fingers, was unable to walk due to muscle atrophy in his legs from lying in bed for a prolonged period of time, and was unable to speak properly due to a tracheotomy. (Tr. 409-11). He testified that after his release from the rehabilitation facility, he needed to return "on and off for a month" and that he still continues to perform certain

rehabilitation exercises on his own. (Tr. 411).  He also testified that he experienced very little pain while in rehabilitation. (Id.).


        (b). <u>Nelson's Account</u>


    Petitioner's accomplice, Richard Nelson, also testified.  He largely corroborated Perine's testimony about the initial encounters with the rival drug dealers and the plan that he and Perine concocted to steal and split the drugs and money. (Tr. 463-65). He also testified that his role in the drug operation was to receive drugs from Williams and to sell packs of the drugs on the street. (Tr. 465-67). He testified that, beginning on June 5, 2004, he saw Williams twice a day until the shooting, and then four to five times a day thereafter, as he continued to sell drugs for Williams and his brother Block. (Tr. 466-67, 478).


    Nelson testified that after he and Perine had agreed on the deal concerning the drugs and money, he proceeded to an apartment on the fourth floor of 868 Amsterdam Avenue to tell petitioner that Perine had stolen drugs from him. (Tr. 468). According to Nelson, Williams had him wait in the hallway as he went into the apartment

to get something. (Tr. 469). After Williams came out, while the two
men were in the elevator, petitioner handed Nelson a gun, which
appeared to him to be a .32 automatic. (Tr. 470). The two men went
to the park in search of Perine, and found him at the entrance to
a playground. Nelson told Perine that Williams wanted to speak with
him about the stolen drugs. The three men walked approximately 20
feet into the park and were within several feet of each other.
Nelson testified that Williams said, "You took another pack?" and
then commanded Nelson to "Shoot him." (Tr. 472). Nelson then fired
several times at Perine. (Tr. 473). He testified that he believed
that his shots would kill Perine. (Tr. 474-75).


After firing the gun, Nelson ran out of the park, while
Williams walked out slowly behind him. Nelson described himself as
wearing a white do-rag, and Williams as having a bald head. (Tr.
473-74). He testified that shortly after leaving the park, he met
Williams at 868 Amsterdam Avenue, wrapped the gun in his t-shirt to
wipe the fingerprints off of it, and then handed it to Williams,
who told him that he would dispose of it. (Tr. 475-7).


Nelson confirmed that he had been arrested by Detective Felder
on September 6, 2004. At the precinct he told the police that

night, and then again on videotape the next morning, that it was Williams who had shot Perine and that Williams had handed him the gun only afterwards. (Tr. 478-80). According to Nelson, in May 2005 he entered into a cooperation agreement with the prosecutors which required his admission that he had in fact shot Perine. As part of his cooperation, he had agreed to testify at the trial of Teddy Williams and to plead guilty to second-degree murder, with the possibility of pleading down to first-degree assault and thereby reducing his sentence from 25 years to a possible minimum of five years. (Tr. 481, 501). Nelson also gave testimony about his criminal past, which included juvenile charges beginning in 2001 for stealing a car, as well as charges for possession and sale of crack cocaine. (Tr. 484-86).

Following Nelson's testimony, the court read a stipulation to the jury concerning the medical records of Richard Nelson. It included the statement that, "had a representative from the psychiatric unit of Elmhurst hospital testified, the person would have testified as follows: 'That in the year 2000, Mr. Richard Nelson . . . was diagnosed and found to be, among other things, one, homicidal; two, violent; three, manipulative; and four sneaky. And that while in that unit, he displayed unpredictable and aggressive behavior.'" (Tr. 513-14).

(c). The Other Eyewitness Testimony

The prosecutor called three civilian eyewitnesses, Elizabeth Jamar, Anthony Korf, and Shanti-Rica Joseph, who all testified that at around 6 a.m. on the morning of June 16, 2004, while in their apartments, they heard what sounded like gunshots and observed two men leaving the park who generally matched the descriptions of Williams and Nelson. Jamar and Joseph each testified they had seen one young Black or Hispanic man wearing a do-rag exit the park running, followed by an older, bulkier and balding man, who was walking more slowly. (Tr. 259-61, 323-25). Korf testified that the first man he saw was walking calmly and was either Caucasian or Hispanic, and that the second man he observed exiting the park was Black and also walked out of the park, behind the first. According to Korf, the second man appeared to be of the same age and build as the first, and was wearing a do-rag on his head. (Tr. 268-70).

(d). The Post-Shooting Witnesses

The State called several witnesses who had responded to the scene of the shooting. Paramedic Luis Parra, Police Sergeant Daniel Waldron and Police Officer Bryant Pineda testified that Perine was

12

unresponsive and had three visible gunshot wounds. (Tr. 275-76, 280, 297-98). Sergeant Waldron also recounted that three shell casings and one bullet were found at the scene. (Tr. 281). Police Sergeant Nicholas Chernjawsky observed blood and shell casings on the ground, the latter of which he took custody of and later gave to Police Officer Sylvia Williams to voucher. (Tr. 292-93).

Officer Pineda reported that after responding on the scene, he went to St. Luke's Hospital to attempt to speak with the victim, but he was unable to do so because of Perine's injuries. (Tr. 296-99). Officer Williams recounted that after reporting to the scene, she had been given ballistics evidence from the crime scene to voucher. (Tr. 308-09).

The detective assigned to the case, Terrence Felder, testified that he received the case on the day of the shooting. He attempted to speak with Perine twice in the month of June but Perine was unable to talk as a result of a tracheotomy. (Tr. 332-35). After an unsuccessful attempt to identify the shooters in July, on September 1 and 2, 2004 the detective visited Perine at the Bronx Lebanon Hospital, a rehabilitation facility, where he showed Perine a photo array and received information that enabled him to arrest Richard

13

Nelson. (Tr. 336-40). Shortly thereafter, Nelson identified Teddy
Williams as the shooter, and Felder arrested him. (Tr. 341).

Detective Mark Basoa testified as an expert witness in the
field of ballistics analysis. (Tr. 365-72). He recounted that he
had received three .32 caliber discharge cartridge casings and one
.32 caliber deformed bullet in a series of intact sealed security
envelopes in a plastic voucher bag. (Tr. 369-70). By conducting a
microscopic comparison of the shell casings, he was able to
determine, with a reasonable degree of scientific certainty, that
all three casings were fired by the same gun. (Tr. 370-71).

### 2. Post-Evidence Proceedings and the Verdict

At the close of the presentation of evidence, defense counsel
moved to dismiss on the ground that the evidence was insufficient
to make out a prima facie case against the defendant. The Court
ruled that "there is more than ample evidence" for the jury to find
that the defendant, in concert with Nelson, committed the five
crimes with which he was charged. (Tr. 515-17). Counsel for the
defendant renewed this motion at the end of the case. (Tr. 519-20).

The jury later returned guilty verdicts on all counts. (Tr.

14

649).

### 3. <u>Sentencing</u>

On October 19, 2005, Justice Goodman sentenced petitioner, as a violent persistent felony offender, to three concurrent indeterminate prison terms of 21 years to life, one term of 16 years to life, and one term of 12 years to life. (Sentencing Tr. ("S. Tr."), 14-16).

### D. <u>The Direct Appeal</u>

Petitioner appealed his conviction to the First Department. He pressed two grounds for relief, both of which he asserts in his current petition. First, he claimed that the verdict was against the weight of the evidence, focusing his discussion primarily on the lack of credibility of both the complainant Perine and the accomplice Nelson. (<u>See</u> Resp't Answer Opposing Pet. for Habeas Corpus Ex. B ("Pet'r App. Br."), 13-19, Oct. 28, 2009). Second, he argued that the evidence other than the testimony of Nelson was insufficient to satisfy the requirement of N.Y. Crim. Proc. L. § 60.22[1] that accomplice testimony be corroborated. (<u>Id.</u> at 20-26).

15

The Appellate Division affirmed Williams's conviction. People v. Williams, 50 A.D.3d 601, 857 N.Y.S.2d 522 (1st Dept. 2008). In doing so, the court held that the accomplice-corroboration claim was unpreserved, and it declined to review it in the interest of justice. Id. at 601-02, 857 N.Y.S.2d at 522. In the alternative, the court observed that, if called upon to review the claim, it would have found it meritless "because the testimony was corroborated by extensive evidence that included the defendant's presence at the scene of the crime and motive for committing it." Id. at 602, 857 N.Y.S.2d at 522. The court then held that the verdict was not against the weight of the evidence, observing that "[t]here is no basis for disturbing the jury's determinations concerning credibility." Id.

Petitioner next moved for leave to appeal to the New York Court of Appeals on the same grounds. That court denied his application on June 25, 2008. People v. Williams, 10 N.Y.3d 940, 862 N.Y.S.2d 347 (2008).

E. The Current Petition

Petitioner finally turned to this court, in which he articulates the same two claims as he pursued in the Appellate

16

Division. Submitting the Table of Contents from his state appellate brief, he argues, first, that the verdict was against the weight of the evidence and, second, that there was insufficient evidence to corroborate the accomplice's testimony. In addition, in his reply he requests that the accomplice claim be read as a constitutional claim of failure to prove his guilt beyond a reasonable doubt.

ANALYSIS

A. The Standard for Habeas Review

The stringency of federal habeas review turns on whether the state courts have passed on the merits of the petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (discussing 28 U.S.C. § 2254(d)). If the state court has addressed the merits, the petitioner may obtain relief only if the state court's ruling:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an

17

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d); see, e.g., Bell v. Cone, 535 U.S. 685, 693-94 (2002); Williams v. Taylor, 529 U.S. 362, 412-13 (2000); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Brown v. Artuz, 283 F.3d 492, 497-98 (2d Cir. 2002).

"[C]learly established" federal law "'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard, 406 F.3d at 122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Id. (quoting Williams, 529 U.S. at 413).

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "'A federal court may not grant habeas simply because, in its independent judgment, the "relevant state-court decision applied clearly established federal law erroneously or incorrectly."'" Id. (quoting Fuller v. Gorczyk, 273

18

F.3d 212, 219 (2d Cir. 2001) (quoting <u>Williams</u>, 529 U.S. at 411)).
The Supreme Court observed in <u>Williams</u> that "unreasonable" did not
mean "incorrect" or "erroneous," noting that the writ could issue
under the "unreasonable application" provision only "if the state
court identifies the correct governing legal principle from this
Court's decisions [and] unreasonably applies that principle to the
facts of the prisoner's case." 529 U.S. at 410-13. The Second
Circuit has interpreted this language to mean that while "[s]ome
increment of incorrectness is required . . . the increment need not
be great; otherwise habeas relief would be limited to state court
decisions 'so far off the mark as to suggest judicial
incompetence.'" <u>Monroe v. Kuhlman</u>, 433 F.3d 236, 246 (2d Cir. 2006)
(quoting <u>Francis S. v. Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000)).


     The Supreme Court's most recent decision examining what
constitutes an 'unreasonable' application of federal law, however,
states that "[a] state court's determination that a claim lacks
merit precludes federal habeas relief so long as 'fairminded
jurists could disagree' on the correctness of the state court's
decision." <u>Harrington v. Richter</u>, 131 S.Ct. 770, 786 (2011)
(quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). "Under
§ 2254(d), a habeas court must determine what arguments or theories
supported, or could have supported, the state court's decision; and

19

then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. Under this more recent interpretation, a federal habeas court has "authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. In other words, to demonstrate an 'unreasonable' application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

As for the state courts' factual findings, under the habeas statute "a determination of a factual issue made by a state court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Richard S., 589 F.3d at 80-81; McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003); see generally Rice v. Collins, 546 U.S. 333, 338-39 (2006).

B. The Weight-of-the-Evidence Claim

Williams first asserts that the verdict was against the weight of the evidence. This claim fails at the outset because it rests purely on state law.

The weight-of-the-evidence argument is based on N. Y. Crim. Proc. L. § 470.15[5], which states that "[t]he kinds of determinations of reversal or modification deemed to be on the facts include . . . a determination that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." This claim is distinct from a federal constitutional claim that the State failed to prove guilt beyond a reasonable doubt. As articulated by the New York Court of Appeals, the two standards may be related, but they each require discrete analyses. See People v. Bleakley, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 763 (1987).

A legal-sufficiency claim relies on the Fifth Amendment guarantee, incorporated by the Fourteenth Amendment to apply to state prosecutions, against conviction except by proof beyond a reasonable doubt. E.g., Sullivan v. Louisiana, 508 U.S. 275, 277-78 (1993); Jackson v. Virginia, 443 U.S. 307, 316 (1979); United

States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002). A legal-
insufficiency claim requires the court to decide whether, if the
evidence is viewed in the light most favorable to the prosecution,
any rational factfinder could find that all the elements of the
crime had been proved beyond a reasonable doubt. See, e.g.,
Jackson, 443 U.S. at 316. This standard gives "full play to the
responsibility of the trier of fact to resolve conflicts in the
testimony, to weigh evidence, and to draw reasonable inferences
from basic facts to ultimate facts." Id. at 319. Additionally,
throughout the appeals process, the "factfinder's role as weigher
of the evidence is preserved through a legal conclusion." Id. The
court may not question the jury's finding of credibility regarding
the witnesses and evidence, and by viewing the evidence in the
light most favorable to the prosecution, it "impinges upon 'jury'
discretion only to the extent necessary to guarantee the
fundamental protections of due process of law." Id.

    In contrast, when a court assesses a weight-of-the-evidence
claim, it delves beyond legal sufficiency to analyze the quality of
the evidence. The court sits "as thirteenth juror", Tibbs v.
Florida, 457 U.S. 31, 42 (1982), and has the power to review the
facts and evidence of the case. The court must "'weigh the relative
probative force of conflicting testimony and the relative strength

of conflicting inferences that may be drawn from the testimony.'"
Bleakley, 69 N.Y.2d at 495, 515 N.Y.S.2d at 763 (quoting People ex
rel. MacCracken v. Miller, 291 N.Y. 55, 62 (1943)). Empowered to
conduct such a factual review, while giving substantial deference
to the trier of fact, the court may critique the line of reasoning
presumptively used by the trier of fact in coming to the verdict.
After such an analysis, if the appellate court finds that the jury
did not give the evidence its proper weight, the court may set
aside the verdict. Id.

These differences illustrate that while a sufficiency-of-the-
evidence claim is based on the United States Constitution, a
weight-of-the-evidence claim is based purely on state law. See
Bleakley, 69 N.Y.2d at 495, 515 N.Y.S.2d at 763;  Jackson v. Heath,
2010 WL 3075557, *12 (S.D.N.Y. Aug. 6, 2010); Tucker v. Phillips,
2008 WL 4128202 at *1 (S.D.N.Y. Sept. 2, 2008); Garrett v. Perlman,
438 F. Supp.2d 467, 470 (S.D.N.Y. 2006); Peralta v. Bintz, 2001 WL
800071 at *4 (S.D.N.Y. July 16, 2001). Therefore such a claim is
not cognizable in a habeas proceeding, since the pertinent statute
allows a district court to entertain an application for a writ of
habeas corpus "only on the ground that he [petitioner] is in
custody in violation of the Constitution or laws or treaties of the
United States." 28 U.S.C. § 2254(a). Accord, e.g., Estelle v.

23

McGuire, 502 U.S. 62, 67-68 (1991).

Since, however, Williams is a pro se litigant, the court must read his pleadings liberally and interpret them to "raise the strongest arguments that they suggest." Pabon v. Wright, 459 F.3d 241 (2d Cir. 2006) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). With that guideline, we might view his weight-of-the-evidence formulation as seeking to pursue an evidentiary-insuffiency claim, which would be cognizable here. See, e.g., Ventura v. Artuz, 2000 WL 9954979 at *7-8 (S.D.N.Y. July 19, 2000); Padro v. Stack, 169 F. Supp.2d 177, 179-180 (S.D.N.Y. 2001). Contra Peralta 2001 WL 800071 at *4; Tucker, 2008 WL 4128202 at *7.[5] Even if we were to so read the petition, however, it would not save Williams's claim.

First, petitioner has not satisfied the exhaustion requirement of section 2254(b) because he never presented an evidentiary-insufficiency argument to the Appellate Division. His arguments were directed exclusively to the weight-of-the-evidence standards under New York Law (see Resp't Answer and App. Ex B, 13-19, Oct.

_____

[5] Indeed, as noted, in petitioner's reply he asks that we treat his second claim -- involving the accomplice-corroboration requirement -- as a federal constitutional claim that his guilt was not proven beyond a reasonable doubt. (Pet'r Traverse, 6).

28, 2009), citing only state cases addressing that test. In that briefing he offered no indication that he was suggesting that his constitutional right not to be convicted except upon proof of guilt beyond a reasonable doubt was violated. This mode of argument did not "fairly present" the constitutional claim to the state courts. See DiSimone v. Phillips, 461 F.3d 181, 190 (2d Cir. 2006)(holding that because petitioner had failed in his state-court brief to cite pertinent federal or state case law or discuss with adequate specificity the claim that he raised in the habeas court, the claim had not been "fairly presented"). See generally Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc).


We note that Williams no longer has an available state-court remedy. He may not pursue a second direct appeal, see Jiminez v. Walker, 458 F.3d 130, 149 (2d Cir. 2006) (explaining that state remedies were no longer available after habeas petitioner had "already taken his one direct appeal"), and cannot assert an evidentiary-insufficiency claim in a section 440.10 motion to vacate because he could have made the argument on his direct appeal. See N.Y. Crim. Pro. § 440.10(2)(a)[6]; Artuz v. Bennett, 531

---

[6] Section 440.10 states that a court must deny a collateral attack on a conviction where:

Although sufficient facts appear on the record of the

U.S. 4, 10-11 (2000) (affirming that a court "must deny" claims for relief that "could have been raised on direct appeal but were not). Hence his claim must be deemed procedurally barred unless he can satisfy the cause-and-prejudice or fundamental-miscarriage-of-justice exceptions to procedural waiver. Coleman v. Thompson, 501 U.S. 722, 749-50 (1990); Fama v. Comm'r of Corr. Serv., 235 F.3d 804, 809 (2d Cir. 2000); Acosta v. Giambruno, 326 F. Supp.2d 513, 520 (S.D.N.Y. 2004). He fails to do so.

To show cause for a default, petitioner must demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). For instance, petitioner might make "a showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or that some 'interference by state officials made compliance impracticable.'" Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994) (quoting Murray, 477 U.S. at 488). The denial of effective assistance of counsel -- if it led to the

---

proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him.

default -- is also recognized as "cause" for the purpose of procedural-bar analysis, but only if the petitioner first presented that Sixth-Amendment theory as an independent claim to the state courts. See, e.g., Edwards v. Carpenter, 529 U.S. 446, 453 (2000); Coleman, 501 U.S. at 753-54; Murray, 477 U.S. at 488.

Williams cannot show cause since his appellate attorney was not prevented from asserting an evidentiary-insufficiency claim on appeal, and plainly chose not to do so because it was obviously meritless. Indeed, such an argument would obviously have been futile since the Appellate Division rejected the weight-of-the-evidence claim, which rests on a less onerous test and also rejected the accomplice-corroboration claim, noting the "extensive evidence" corroborating the testimony of Nelson. Williams, 50 A.D.3d at 602, 857 N.Y.S.2d at 522.

As for the fundamental-miscarriage exception, it is reserved for the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Sawyer v. Whitley, 505 U.S. 333, 339 n. 6 (1992), reh'g denied, 505 U.S. 1244 (1992)(quoting Murray, 477 U.S. at 496). Moreover, to demonstrate actual innocence, the petitioner must proffer new and reliable evidence not found in the trial record.

See, e.g., Calderon v. Thompson, 523 U.S. 538, 559 (1998); Schlup v. Delo, 513 U.S. 298, 327 (1995). Petitioner cannot meet this demanding standard, since the trial evidence overwhelmingly demonstrated his guilt, and in any event he has proffered no new evidence that he was actually innocent of the crime. Accord Murray, 477 U.S. 496 (1986).

Second, as is evident from our summary of the record, an evidentiary-insufficiency claim would have to be rejected in any event as meritless. When a petitioner attacks his state conviction on sufficiency grounds, the relevant inquiry is "'whether, after viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994) (emphasis in the original) (quoting Jackson, 443 U.S. at 319). The State is not required to eliminate every possible hypothesis that is consistent with innocence. United States v. Fiore, 821 F.2d 127, 128 (2d Cir. 1987).

The evidence in this case was ample to persuade a rational juror to find Williams guilty beyond a reasonable doubt on the five charges at issue.

Petitioner was convicted on all five counts as an accomplice. Under New York law, a person is criminally liable for the conduct of another "[w]hen acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct." N.Y. Penal Law § 20.00. On the first count, petitioner was convicted of attempted second-degree murder. To establish his guilt on this charge, the State had to prove that, as an accomplice, petitioner intended to cause the death of Scott Perine and engaged in conduct that would tend to effect the result. N.Y. Penal Law §§ 110.00, 125.25; see People v. Wells, 7 N.Y.3d 51, 55-56, 817 N.Y.S.2d 590, 592-93 (2006); People v. Kaid, 43 A.D.3d 1077, 1080-81, 842 N.Y.S.2d 55, 58-59 (2d Dept. 2007).

The evidence at trial was ample to allow a rational jury to find the charge proven beyond a reasonable doubt. Nelson testified that Williams intended to cause the death of Perine by both commanding and intentionally aiding Nelson in the commission of the crime. First, Nelson testified that he had told Williams that Perine had stolen drugs and money from Nelson that belonged to William's operation. Petitioner had then supplied him with a gun. (Tr. 469-70). The gun was the essential weapon in the commission of the shooting and the cause of Perine's injuries; therefore by

providing the firearm, Williams substantially "aid[ed]" Nelson in his actions. See N.Y. Penal Law § 20.00. Second, Nelson testified that Williams had decided to search for Perine, and that during the confrontation among the three men in the park, petitioner had instructed Nelson to "shoot him," which certainly can be interpreted as a "command" or order. (Tr. 472). Furthermore, the prosecution presented evidence that Nelson was an underling within petitioner's and his brother's drug dealing operation, thus supporting the inference that petitioner had the authority to give commands to Nelson.

The evidence also strongly supported the necessary finding that the intention in shooting Perine was to kill him. Nelson explained that he fired the gun and "kept squeezing the trigger." (Tr. 473). When asked what he thought would happen to Perine, Nelson responded, "I thought he was gonna die", and he confirmed that he believed that his actions would kill Perine. (Tr. 474-75). Moreover, the State offered at least some corroborating testimony from Jamar, Korf and Joseph, who heard gunshots and observed two men who might have matched the appearances of Nelson and Williams exiting the park after the shooting.

Petitioner's   argument   in   support   of   his   claim   rests

essentially on his challenge to the credibility of Nelson, but credibility assessments are for the jury. The court may not "ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt." Jackson, 443 U.S. at 318 (emphasis in original). Rather, the only permissible inquiry into the record is whether any reasonable jury could have found the essential elements of the crime beyond a reasonable doubt if it deemed the State's witnesses to be credible. That is the case here.

The same analysis follows with respect to the remaining convictions. Counts two and three charged two variations of first-degree assault, the first requiring proof of intent to cause serious physical injury of another person and the second requiring that the defendant be shown to have acted "with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body". N.Y. Penal Law § 120.10[2]. The petitioner was charged as an accomplice, and the evidence documenting his motive to harm Perine, his provision to Nelson of a firearm and his command to Nelson to shoot, establish his role in the assault.

On command from Williams, Nelson repeatedly fired the gun and admitted that he thought that the shooting would kill Perine. This

31

establishes an intent to kill. A jury could certainly rationally conclude that such intent encompasses an intent to seriously harm or disfigure.

Beyond the intent element, to satisfy the first version of assault, the defendant must have caused such physical injury by means of a deadly weapon or a dangerous instrument. "Deadly weapon" means "any loaded weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged". N.Y. Penal Law §10[12]. Perine and Nelson both testified that the gun used to shoot Perine was a .32 automatic. (Tr. 397, 476). This was confirmed by various police witnesses, including Detective Basoa, who testified as an expert witness concerning firearms analysis. (Tr. 370). Obviously the evidence demonstrated the use of a deadly weapon.

"Serious physical injury" means "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10[10]. According to the paramedic Parra, Perine sustained several gunshot wounds -- one in the vicinity of the left rib cage, one in the shoulder, and one in the

32

forearm. (Tr. 275). He also testified that Perine was going into shock when discovered. (Id.) This was corroborated again by the various police witnesses who had arrived on scene. According to Perine and Detective Felder, Perine needed a tracheotomy because of his injuries. (Tr. 335, 401).

Perine remained unresponsive and incapacitated for approximately a month. (Tr. 402). Perine's extensive course of recovery is indicative of a substantial risk of death as well as a protracted impairment of his health. Hence, the State provided sufficient evidence to establish all elements of count two.

To satisfy all elements of count three, the State needed to prove that Perine suffered permanent and serious disfigurement, amputation or permanent disability of a member or organ of his body. Perine testified that after being released from the hospital, he went to a rehabilitation center for nearly four months for occupational, physical and speech therapy. (Tr. 408-09). He testified that as a result of the gunshot wound to his arm, he was unable to move his left pinky and ring finger on his dominant hand, which thus prevented him from completing routine tasks. (Tr. 409). Perine also testified that he was initially unable to walk because his leg muscles had atrophied while he was lying in bed for over a

33

month. (Tr. 410). Finally, he was unable to speak for a time due to his tracheotomy. (Tr. 411).

To satisfy subsection [2] of first-degree assault, permanence must be shown. When the prosecutor asked, "About how long was it before you were able to walk normally again?" Perine responded, "About November of that year." (Tr. 410). Similarly, when the prosecutor asked, "And how long was it before you could speak normally again?" Perine responded, "Around November." Additionally, when asked if he suffered pain while in the rehabilitation facility, Perine responded that he experienced very little and that any pain diminished over time. (Tr. 411-12).

Normally, cases that charge permanent disfigurement include situations "wherein the victim is maimed by acid; a box cutter; a razor; or where the nature of the injuries themselves support such an inference: i.e., serious permanent scarring and/or multiple facial cuts multiple body cuts; necessity of plastic surgery; viciousness of the attack; severity of scarring." People v. Tran, 188 Misc.2d 717, 719 729 N.Y.S.2d 851 (N.Y.Sup.Ct. 2001) (internal citations omitted). The State did not offer any medical testimony beyond Perine's own accounts of his rehabilitation, but there is mention of Perine's medical records, and the jury requested to

34

review them during deliberations. (Tr. 645-46). Moreover, Perine
testified, after being asked how long he continued to participate
in the rehabilitation, that he "continue[s] to do certain exercises
on [his] own," suggesting that he continued to suffer from the
effects of his injuries. (Tr. 411). Although this does not conform
to the "classic" examples under section 120.10[2] cited in Tran, it
does offer evidence of a permanent disability of a member of his
body. A jury could interpret this testimony, along with the medical
records they examined, to mean that Perine, at the time of the
trial -- which was more than a year after the shooting -- was still
experiencing disabilities to his legs, fingers, and speech. This
court must give deference to the jurors both with respect to his
physical condition (which they observed) and his testimonial
credibility. Given that deference, the record contains sufficient
evidence to support the guilty verdict on count three.


    Counts four and five charged criminal possession of a weapon
in the second and third degrees respectively. To convict under
section 265.03[2], the prosecution must demonstrate that the
defendant possessed a loaded firearm with the intent to use it
unlawfully against another. The jury here had the testimony of both
Perine and Nelson to support a conviction on the charge. The same
analysis supports the conviction under section 265.02[4], the

elements of which include possession of a loaded firearm outside of the defendant's home or place of business.

In sum, viewed in the light most favorable to the State, the evidence plainly was ample enough to permit a reasonable fact-finder to conclude beyond a reasonable doubt that petitioner was guilty of all five crimes charged.

D. The Accomplice-Corroboration Claim

Petitioner's second claim, cited from his state appellate brief, is that "[u]nder C.P.L. 60.22[1], the evidence was insufficient to corroborate the testimony of Richard Nelson - the accomplice as a matter of law who shot the victim - and therefore did not tend to connect the defendant with the commission of the offense." (Pet'r. App. Br., 20). This claim fails for multiple reasons.

First, the claim as articulated in state court and here does not arise from federal law. Rather, it is purely an artifact of New York statutory law. The cited provision states: "A defendant may not be convicted of any offense upon testimony of an accomplice unsupported by corroborative evidence tending to connect the

defendant with the commission of such offense." N.Y. Crim. Proc. L. §60.22[1].

As noted, "federal habeas relief does not lie for errors of state law." Estelle, 502 U.S. at 67 (citing Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). A federal habeas court is restricted to deciding whether a conviction violated the "Constitution, laws, or treaties of the United States." Id. at 68.

In seeking to avoid this conclusion, Williams asserts that his accomplice-corroboration claim, even if based on New York State law, implicates Due Process concerns under the Fourteenth Amendment. This is plainly not true.

It is well established that in federal court a conviction can stand on accomplice testimony alone: "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them." Caminetti v. United States, 242 U.S. 470, 497 (1917). A conviction may be sustained on the basis of the "uncorroborated testimony of even a single accomplice witness 'if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.'" United States v. Florez, 447 F.3d 145, 155 (2d Cir. 2006) (citing United States v.

Parker, 903 F.2d 91, 97 (2d Cir. 1990)); see, e.g., United States v. Hamilton, 334 F.3d 170, 179 (2d Cir. 2003); United States v. Gordon, 987 F.2d 902, 906 (2d Cir. 1993). For federal law purposes, the "lack of corroboration goes merely to the weight of the evidence, not its sufficiency." United States v. Zapata, 205 F.3d 1327, *1 (2d Cir. 2000) (quoting United States v. Parker, 903 F.2d 91, 97 (2d Cir. 1990). See Florez, 447 F.3d at 155; Gordon, 987 F.2d at 906.

Even if petitioner's claim could be read as based on federal constitutional law, it would be procedurally barred. "Because of comity and federalism concerns and the requirement that States have the first opportunity to correct their own mistakes, federal habeas courts generally may not review a state court's denial of a state prisoner's federal constitutional claim[s] if the state court's decision rests on a state procedural default that is independent of the federal question and adequate to support the prisoner's continued custody." Epps v. Comm'r of Corr. Serv., 13 F.3d 615, 617 (2d Cir. 1994) (citing Coleman 501 U.S. at 750). As previously noted, however, procedurally defaulted claims may be reviewed by a federal court if the petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result

38

in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750.
<u>See also</u> <u>Murray</u>, 477 U.S. at 495-96; <u>Wainwright v. Sykes</u>, 433 U.S.
72, 87 (1977); <u>Bossett</u>, 41 F.3d at 829.


The State argued on appeal that Williams's accomplice-
corroboration claim was unpreserved because he had not raised it in
the trial court, as required by N.Y. Crim. Proc. L. § 470.05[2].
(Resp't Answer Ex. C, 14). The Appellate Division explicitly relied
on this ground in rejecting the claim, stating that "Defendant's
argument regarding the sufficiency of the evidence corroborating
the testimony of his accomplice is unpreserved and we decline to
review it in the interest of justice." <u>Williams</u>, 50 A.D.3d at
60102, 857 N.Y.S.2d at 522. Although the panel went on to observe,
as an alternative, that if had reviewed the claim it would have
found it meritless, <u>id.</u>, that alterative holding does not alter the
applicability of procedural-bar analysis. <u>E.g.</u>, <u>Harris v. Reed</u>, 489
U.S. 255, 264 n.10 (1989) (explaining that "a state court need not
fear reaching the merits of a federal claim in an <u>alternative</u>
holding" because a federal habeas court must honor a state-court
judgment as long as the state court invokes state-law procedural
bar "as a separate basis for decision") (emphasis in original);
<u>Galdamez v. Keane</u>, 394 F.3d 68, 77 (2d Cir. 2005) (stating that,
where the state court is clear that a claim fails on the basis of

39

a state-law procedural bar and proceeds to address the merits, the claim remains procedurally barred); Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999) (rejecting as procedurally barred a habeas claim where the Appellate Division both expressly invoked the procedural bar and also spoke to the merits of petitioner's claim); Sanchez v. Lee, 2011 WL 924859, *14 (S.D.N.Y. Mar. 16, 2011).

The Second Circuit has consistently held that New York's contemporaneous-objection rule is an independent and adequate state ground for refusing to address the merits of a claim, and that a petitioner's failure to comply with it bars a federal court from review of his claims. See, e.g., Ocean v. Cunningham, 120 Fed.Appx. 392, 393 (2d Cir. 2005); Garcia, 188 F.3d at 78-79; Watkins v. Artus, 2010 WL 5060861, *11 (S.D.N.Y. July 22, 2010); Reese v. Greiner, 2003 WL 21459577, *5 (S.D.N.Y. June 23, 2003). Moreover, that rule is consistently applied by the state courts to claims of insufficient evidence. See, e.g., People v. Carncross, 14 N.Y.3d 319, 324-25, 901 N.Y.S.2d 112, 115 (2010) ("Given defendant's failure to argue with particularity that the evidence was legally insufficient . . . we are foreclosed from reviewing that claim here"); People v. Kolupa, 13 N.Y.3d 786, 787, 887 N.Y.S.2d 536, 536 (2009); People v. Gray, 86 N.Y.2d 10, 19, 629 N.Y.S.2d 173, 175 (1995) (observing that the "preservation mandate is not new");

40

Miller by Miller v. Miller, 68 N.Y.2d 871, 873, 508 N.Y.S.2d 418, 419 (1986) (citing cases) (reversing an Appellate Division decision where plaintiff had not properly raised the claim at issue during trial because the appeals court "exceeded its power of review"). Therefore, absent any justification for invoking either of the exceptions to the application of the procedural-bar rule, this court is precluded from considering petitioner's claim regarding accomplice corroboration.

As noted, a procedurally barred claim may be considered if the petitioner can show "cause" and "prejudice" for his default or a fundamental miscarriage of justice. See, e.g., Coleman, 501 U.S. at 750; Bossett, 41 F.3d at 829. Here, petitioner has not even attempted to show cause. His attorney was of course free to invoke the accomplice-corroboration claim at trial but chose not to do so, presumably because the claim was meritless, as the Appellate Division later found. Further, Williams cannot show cause by attacking his attorney's trial performance, as he seeks to do in his reply. This assertion -- if deemed an effort to assert cause for his procedural default -- fails for several reasons. Most obviously, as the Supreme Court noted in Edwards, "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted," and

41

a defaulted Sixth-Amendment claim cannot serve as cause for overcoming a procedural bar. 529 U.S. at 453. Petitioner did not assert his newly articulated Sixth-Amendment claim in state court, and therefore it cannot be asserted here as the basis for a showing of cause. Moreover, the criticisms of his counsel that he asserts in his reply do not involve the attorney's failure to raise the accomplice-corroboration issue.[7]

As for the other exception to the procedural-bar rule, Williams has not shown that a failure to consider the claim here would result in a fundamental miscarriage of justice. Although in his reply petitioner states that "'[a]ctual innocence" [is] one of the contentions within the Appeal brief, and [is] currently before this Court," he has offered no new evidence to demonstrate "actual innocence," and the record strongly establishes his guilt. This exception is reserved for the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Sawyer, 505 U.S. at 339 (quoting Murray, 477 U.S. at 496). Petitioner has made no such

---

[7] Petitioner claims that his trial counsel failed to "interview the prosecution's witnesses (in the adversarial context)" and to "pose objections (with curative instructions) sufficiently to the many inconsistencies in those witnesses testimonies [sic]." (Pet'r Trav., 2).

demonstration, nor could he reasonably do so.

Therefore petitioner's claim is procedurally barred from review as well as not cognizable in this habeas proceeding. Finally, for reasons already noted, even if this claim were assessed on its merits, it would fail since the testimony of Mr. Nelson was amply corroborated by the testimony of other witnesses.

CONCLUSION

For the reasons stated, we recommend that the writ be denied and that Williams' petition be dismissed. As Williams has failed to make a substantial showing of the denial of a constitutional right, we also recommend that a certificate of appealability not be issued. 28 U.S.C. § 2253(c).

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Richard J. Holwell, Room 1950, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007.

Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 470 U.S. 140, 150-52 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

Dated: New York, New York
       March 30, 2011

                              Respectfully submitted,


                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE


Copies of the foregoing Report and Recommendation have been mailed today to:

Mr. Teddy Willliams
05-A-5627
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562

Sara M. Zausmer, Esq.
Assistant District Attorney
New York County
One Hogan Place
New York, NY 10013